IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: AUTOMOTIVE REFINISHING | : | |
| PAINT ANTITRUST LITIGATION | : | MDL NO. 1426 |
| | : | |

**SURRICK, J.**                                                                                        **JUNE 29, 2005**

<u>**MEMORANDUM & ORDER**</u>

Presently before the Court is Plaintiffs'[1] Motion to Compel the European Council of the

Paint, Printing Ink and Artists' Colours Industry ("CEPE") to Respond to Plaintiffs' Request for

Production of Documents and Memorandum in Support.  (Doc. No. 143.)  For the following

reasons, Plaintiffs' Motion will be granted in part and denied in part.[2]

**I.       BACKGROUND**

**A.       Underlying Action**

In this antitrust class action, Plaintiffs allege that from January 1, 1993, to December 31,

2000 (the "Class Period"), various domestic and foreign manufacturers of automotive refinishing

paint "conspir[ed] to fix, raise, maintain or stabilize prices for automotive refinishing paint in the

United States" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  (Doc. No. 3 ¶ 1.)

The Defendants are E.I. DuPont de Nemours and Company and DuPont Performance Coatings,

Inc. ("DuPont"); BASF Aktiengesellschaft, BASF Coatings AG, and BASF Corp. ("BASF");

PPG Industries, Inc. ("PPG"); Sherwin-Williams Co. and Sherwin-Williams Automotive

Finishes Corp. ("Sherwin-Williams"); and Akzo Nobel Car Refinishes and Akzo Nobel

---

[1] In this Memorandum, "Plaintiffs" or "the Class" are used interchangeably to refer to the
Class Representatives and the unnamed Class Members.

[2] The partial denial of Plaintiffs' Motion to Compel relates only to the scope of the
discovery requested.  *See infra* Part III.D.

Coatings, Inc. ("Akzo").[3]  Plaintiffs seek damages, injunctive relief, and attorney's fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

**B.    CEPE**

CEPE is an international non-profit trade association headquartered in Brussels, Belgium, and organized under Belgian law.  (Doc. No. 148 Ex. 1 ("Schoder Decl.") ¶ 1.)  It represents and promotes the interests of approximately 1100 paint, 150 printing ink, and 20 artists' color companies.  (Doc. No. 143 Exs. A, B.)  Among its members are four of Defendants' European affiliates or subsidiaries, Akzo Nobel NV, BASF Coatings AG, DuPont Performance Coatings, and PPG Industries International, Inc.  CEPE, *Company Members*, *at* http://www.cepe.org/ homepage (last visited June 25, 2005).  CEPE's membership also includes the national trade associations for the paint and printing ink industries in various European countries.  (Schoder Decl. ¶ 4.)  CEPE does not have a legal affiliation with any entity located solely in the United States, nor does it have any corporations organized under the laws of any state of the United States as a member.  (*Id.* ¶ 5.)  CEPE does not have any property, investments, bank accounts, records, or employees located in the United States, nor does it have a registered agent in the United States.  (*Id.* ¶ 3.)

CEPE is a member of the International Paint and Printing Ink Council ("IPPIC"), an international non-governmental organization comprised of regional paint and printing ink associations representing Asia, Australia, Brazil, Canada, Europe, Japan, Mexico, and the United

---

[3] On September 5, 2003, and September 27, 2004, after providing notice to all potential Class Members and holding fairness hearings, we granted final approval of partial settlements between the Class and Defendants Akzo, BASF, and DuPont.  (Doc. Nos. 108, 135.)  The remaining Defendants in this action are PPG and Sherwin-Williams.

States.  (*Id.* ¶ 6.)  CEPE's former President is the Chairman of IPPIC.  (*Id.*)  The National Paint and Coatings Association, Inc. ("NPCA"), a non-profit trade association that represents paint and coating manufacturers, suppliers, and distributors located in the United States, is also a member of IPPIC.  (Doc. No. 143 Ex. J.)

In 2000, NPCA and CEPE jointly established a Worldwide Vehicle Refinishing Product-Oriented Group ("Worldwide P-O.G.") for the stated purpose of "provid[ing] for cooperative sharing of information concerning industry trends, product developments, . . . safety, . . . environmental compliance information[,] and coordination of regulator and legislative activities" in the global market for automotive refinishing paint.  (*Id.* Ex. O at 1; *see also* Doc. No. 151 Ex. 35.)  Representatives of CEPE, NPCA, Akzo Nobel, BASF, DuPont, PPG, and Sherwin-Williams have participated in the Worldwide P-O.G.  (*Id.* Exs. N, R, V, AA; Doc. No. 151 Ex. 4.)  Participants in the Worldwide P-O.G. agreed to the exchange of sales volume data on a quarterly basis for the global market for automotive refinishing paint.  *See, e.g.*, Doc. No. 151 Ex. 4 at SW2500039 ("To have a better understanding of the market, it was agreed that CEPE, in addition to the existing statistics, will also assess the size of the whole market in volume and value."); Ex. 34 at SW2200505 ("[T]here is the need for a Worldwide Refinish POG to address matters, such as collecting worldwide statistical information for the industry . . . .").  To facilitate the exchange of this information, representatives of CEPE and Defendants agreed to hire Herman-Josef Drexler as a Vehicle Refinish Coordinator and share the costs of his salary.  (Doc. No. 151 Ex. 4 at SW250038-SW250039, Ex. 6 at 1-2, Ex. 9 at SW003056047-SW003056048.)  This data, which was coordinated by Drexler and distributed to members of the Worldwide P-O.G. by Jean Schoder, CEPE's Secretary General, contained information regarding the aggregate

sales volume of Defendants' automotive refinishing products by geographic region.  (Doc. No. 143 Ex. M; Doc. No. 151 Exs. 2, 14, 16, 18, 23, 31.)  The exchange of information continued at least through August, 2001.  (Doc. Nos. 143 Ex. M, 151 Ex. 31.)

### C.      Subpoena and Motion to Compel

On September 9, 2003, Plaintiffs served Jean Schoder, CEPE's Secretary General, with a subpoena duces tecum and request for production of documents while he was attending a meeting of the IPPIC's Coating Care® / Industry Stewardship Coordinating Committee in Washington, D.C.  (Schoder Decl. ¶¶ 1, 7; Doc. No. 143 at 2-3.)  The subpoena and document request seek the production of all records and documents in CEPE's possession regarding the following subjects:  (1) CEPE's organizational structure; (2) Defendants' (or its corporate affiliates') membership in CEPE; (3) CEPE's meetings or communications with Defendants; (4) domestic, foreign, or international governmental investigations, claims, and/or litigation pertaining to Defendants' alleged anticompetitive activities; and (5) information pertaining to the prices of automotive refinishing paint, Defendants' market shares in the United States, and communication between Defendants about these subjects.  (Doc. No. 143 Ex. D.)

CEPE, acting through counsel, objected to the subpoena and refused to produce the requested documents.  (*Id.* Ex. E.)  On December 14, 2004, Plaintiffs filed a Motion to Compel production of the documents specified in the subpoena.  On February 10, 2005, after the Motion and supporting documents were served,[4] CEPE filed an objection to the production of the

---

[4] On December 13, 2004, in conjunction with their Motion to Compel, Plaintiffs filed a Motion to Disclose Confidential Materials to CEPE, as several exhibits filed in support of Plaintiffs' Motion to Compel were covered by a Protective Order.  After obtaining the consent of the producing parties, we granted Plaintiffs' Motion for Leave to Disclose on January 20, 2005. (Doc. No. 145.)  The Motion to Compel and supporting documents were served on CEPE on

requested documents.  (Doc. No. 148).  In its opposition, CEPE asserts that the subpoena should

not be enforced because:  (1) this Court lacks personal jurisdiction over CEPE; (2) service of the

subpoena violates Federal Rule of Civil Procedure 45; (3) the subpoena requests are unduly

burdensome; and (4) to the extent that CEPE is subject to discovery, Plaintiffs are required to

invoke the procedures of the Hague Convention on the Taking of Evidence Abroad in Civil or

Commercial Matters ("Hague Convention"), 23 U.S.T. 2555 (1970), to conduct international

discovery.  Plaintiffs filed a reply on March 7, 2005.  (Doc. No. 151.)

## II.     APPLICABLE LAW

As a preliminary matter, we must determine what law applies for purposes of deciding the

instant Motion.  The federal statute governing multidistrict litigation ("MDL"), 28 U.S.C. §

1407, provides that "[t]he judge or judges to whom [MDL] actions are assigned . . . may exercise

the powers of a district judge in any district for the purpose of conducting pretrial depositions in

such coordinated or consolidated pretrial proceedings."[5]  28 U.S.C. § 1407(b) (2000).  The MDL

statute thus authorizes a transferee court[6] judge to sit as the court in "'other districts to hear and

decide motions to compel discovery from non-parties.'"  *In re Sunrise Sec. Litig.*, 130 F.R.D.

January 24, 2005.  (Doc. No. 146.)

[5] Although § 1407(b) refers to "pretrial depositions," the statute has been construed to encompass subpoenas duces tecum as well.  *See, e.g.*, *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 74-75 (D.D.C. 2002); *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 585-87 (E.D. Pa. 1989); *see also* 17 James Wm. Moore et al., Moore's Federal Practice § 112.07[1][b] (3d ed. 2004) (stating that, pursuant to § 1407, a "transferee judge has jurisdiction to order nonparties to comply with a subpoena duces tecum issued by another district judge").

[6] The transferee court is the court assigned by the Judicial Panel on Multidistrict Litigation to handle the pretrial proceedings of the various MDL actions.  J.P.M.L. Rule 1.6(a).

560, 586 (E.D. Pa. 1989) (quoting *In re Uranium Antitrust Litig.*, 503 F. Supp. 33, 35 (N.D. Ill. 1980)); *see also id.* ("[A] multidistrict judge may decide a motion to compel a non-party in other districts even if he or she is not physically situated in those districts."); 17 James Wm. Moore et al., Moore's Federal Practice § 112.07[1][b] (3d ed. 2004) ("[T]he [MDL] judge has jurisdiction to order nonparties to comply with a subpoena duces tecum issued by another district judge. There is no requirement that the [MDL] court or judge be physically present in the other district to decide a motion to compel production pursuant to a subpoena issued by another district." (footnotes omitted)).  The Third Circuit has stated in dicta that § 1407(b) "empowers the transferee judge in multidistrict cases to act not only on behalf of the transferee district, but also with 'the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings.'"  *In re Flat Glass Antitrust Litig.*, 288 F.3d 83, 90 n.12 (3d Cir. 2002) (internal citations omitted).  Accordingly, under § 1407(b), we may adjudicate the Motion to Compel pursuant to our authority as an MDL transferee court.

We are satisfied that the goals of § 1407(b) are best served by applying the transferee court's interpretations of federal law, rather than being bound by the precedents of the subpoena-issuing court.  "Section 1407 is designed to provide for the 'just and efficient conduct' of related cases filed in various federal districts by consolidating them for pre-trial purposes before one court."  *Menowitz v. Brown*, 991 F.2d 36, 40 (2nd Cir. 1993); *see also* Manual for Complex Litigation (Fourth) § 20.131, at 220 (2004) ("The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation costs, and save the time and effort of the parties, the attorneys, the witnesses, and the courts.").  The legislative history of § 1407 "makes it clear that [the statute's] remedial aim is to eliminate the potential for

6

conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in

multidistrict related civil actions." *In re Plumbing Fixtures Cases*, 298 F. Supp. 484, 491-92

(J.P.M.L. 1968). This purpose would be undermined if we were required to apply the precedents

of each court issuing a discovery subpoena, rather than relying on the law of the transferee forum.

*See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, 2005

WL 106936, at *5 (S.D.N.Y. Jan. 18, 2005) ("[W]ithout limiting the sources of binding

precedent, each motion in multi-district litigation could easily turn into a review of the

interpretations of all or most of the circuits, a result at odds with the fundamental purpose of

section 1407. This would have a debilitating effect on the court's ability to resolve motions in a

timely and efficient manner."); *see also* Richard L. Marcus, *Conflicts Among Circuits and

Transfers Within the Federal System*, 93 Yale L.J. 677, 717 (1984) ("The stated goal of

multidistrict transfer is to allow coordinated or consolidated pretrial preparation. . . . Applying

divergent legal standards may undermine consolidation."). Moreover, because "[d]iscovery

disputes that arise in an MDL action are appealed to the circuit in which the action originated," it

is sensible for reasons of "uniformity and intra-circuit consistency" to apply the law of the forum

where the MDL action is being adjudicated. *United States ex rel. Pogue v. Diabetes Treatment

Ctrs. of Am., Inc.*, Civ. A. No. 99-3298, 2004 U.S. Dist. LEXIS 18747, at *16 (D.D.C. May 17,

2004). While the "the law of [the subpoena-issuing] forum on a federal question . . . merits close

consideration," we conclude that it "does not have *stare decisis* effect in a[n] [MDL] forum

situated in another circuit." *In re Korea Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir.

1987), *aff'd on other grounds sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

Accordingly, we will apply the law of the Third Circuit in resolving the instant Motion.

III.     **DISCUSSION**

A.      **Personal Jurisdiction**

CEPE asserts that we lack personal jurisdiction over it as a nonparty witness, and thus cannot require it to respond to Plaintiffs' discovery requests, for two reasons.  First, CEPE argues that it does not have sufficient minimum contacts with the forum issuing the subpoena, the District of Columbia.  (Doc. No. 148 at 1, 4-9.)  Second, CEPE argues that even if it had the necessary minimum contacts, the Court's assertion of personal jurisdiction would violate the requirement of "fair play and substantial justice" inherent in constitutional due process.  (*Id.* at 9-10.)

1.      National Contacts Requirement

A federal court must have personal jurisdiction over a nonparty witness in order to compel it to comply with a valid discovery request under Federal Rule of Civil Procedure 37. *See, e.g.*, *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998) (holding that service of a subpoena on a nonparty witness satisfied due process if the court had personal jurisdiction); *In re Application to Enforce Admin. Subpoenas Duces Tecum v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (concluding that the court has personal jurisdiction over the nonparty witness and compelling compliance with a subpoena); *Ariel v. Jones*, 693 F.2d 1058, 1061 (11th Cir. 1982) (quashing a subpoena based on the nonparty's lack of contacts with the forum); Gary B. Born, International Civil Litigation in United States Courts 865 (3d ed. 1996) ("[A] non-party witness can only be compelled to produce documents if it is subject to the court's personal jurisdiction.").  The issue of personal jurisdiction in federal question cases must be analyzed within the context of the familiar "minimum contacts" test enunciated in *International Shoe Co.*

*v. Washington*, 326 U.S. 310 (1945).  *De James v. Magnificence Carriers, Inc.*, 654 F.2d 280,

283 (3d Cir. 1981).  Under *International Shoe*, the exercise of personal jurisdiction is permissible

if:  (1) the entity has "minimum contacts" with the territory of the "forum," and (2) the assertion

of jurisdiction over the entity comports with "'traditional notions of fair play and substantial

justice.'"  *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

　　Plaintiffs and CEPE disagree over what constitutes the relevant "forum" for assessing

CEPE's minimum contacts.  Plaintiffs assert that we should consider CEPE's contacts with the

United States as a whole, using a "national contacts" analysis.  (Doc. Nos. 143 at 4, 151 at 2-3.)

CEPE argues that we should consider only its contacts with the forum where the subpoena was

issued, the District of Columbia.  (Doc. No. 148 at 5-9 & n.3.)

　　It is well settled that under the Fourteenth Amendment, the forum of a state court is the

state itself.  *Id.*; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Similarly,

in a diversity action, a federal court may exercise personal jurisdiction only "to the extent

permissible under the state law of the jurisdiction where the court sits."  *Grand Entm't Group,*

*Ltd. v. StarMedia Sales, Inc.*, 988 F.2d 476, 481 (3d Cir. 1993) (citing Federal Rule of Civil

Procedure 4(e)).  This is because in a suit solely founded on diversity jurisdiction, a federal court

operates as another court of the forum state, *Guaranty Trust Co. v. York*, 326 U.S. 99, 108

(1945), and is bound by the state court's own limitations on its jurisdiction.

　　However, in a federal court action arising under federal law, the proper forum for

assessing minimum contacts is the United States as a whole.  In a case arising under federal law,

a district court exercises the judicial power of the United States, rather than that of the court's

forum state.  *See, e.g.*, *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir.

9

2001) (concluding that in federal question cases, "[t]he jurisdiction whose power federal courts exercise is the United States of America, not the [forum state]").  Article III of the Constitution states that "[t]he judicial Power of the United States . . . shall be vested . . . in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 2. Congress has vested the district courts with original jurisdiction over "all actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331 (2000).  Thus, a federal court in a federal question case thus exercises the judicial power of the entire United States, *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987), "not a judicial power constitutionally limited by the boundaries of a particular district."[7]  *Fed. Trade Comm'n v. Jim Walter Corp.*, 651 F.2d 251, 256 (5th Cir. Unit A 1981) (footnote and citation omitted); *see also Trans-Asiatic Oil, Ltd. S.A. v. Apex Oil Co.*, 743 F.2d 956, 959 (1st Cir. 1984) ("[T]he judicial power of the United States extends to the physical boundaries of the nation."); Graham C. Lilly, *Jurisdiction Over Domestic and Alien Defendants*, 69 Va. L. Rev. 85, 123 (1983) ("[T]he sovereign territory of the national government spans the fifty states and thus, under the accepted view, enables Congress to provide for jurisdiction over persons and properties within

---

[7] This is particularly true in an MDL action, where the transferee court serves as a national forum for pretrial discovery purposes.  The purpose of the MDL statute is to consolidate and coordinate pretrial proceedings in one court to "avoid[] . . . conflicting and duplicative pretrial demands on parties and witnesses in related cases."  *In re Regents of Univ. of Cal.*, 964 F.2d 1128, 1131 (Fed. Cir. 1992).  Accordingly, the Judicial Panel on Multidistrict Litigation has determined that, following a transfer under 28 U.S.C. § 1407(b), "the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer."  *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976).  We note that the United States Court of Appeals for the Second Circuit has construed § 1407 to authorize a transferee court to exercise personal jurisdiction based on a national contacts analysis.  *In re "Agent Orange" Prods. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987).

the boundaries of the United States.").

The minimum contacts analysis in diversity and federal question actions are guided by separate constitutional provisions.  The Fifth Amendment's Due Process Clause applies to the federal government, including the federal courts, while the Fourteenth Amendment Due Process Clause applies to the states.  *See, e.g.*, *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1143 (7th Cir. 1975); *see also* Fed. R. Civ. P. 4(k) advisory committee note ("[C]onstitutional limitations on the exercise of territorial jurisdiction by federal courts . . . . arise from the Fifth Amendment rather than from the Fourteenth Amendment, which limits state-court reach . . . .").  Accordingly, numerous courts have held that, in federal question cases, the constitutional limits of the court's personal jurisdiction are fixed by the boundaries of the Fifth Amendment's Due Process Clause.  *See, e.g.*, *United States Sec. & Exch. Comm'n v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997) ("'When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, . . . by the Due Process Clause of the Fifth Amendment.'" (quoting *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992))); *Akro Corp. v. Luker*, 45 F.3d 1541, 1544 (Fed. Cir. 1995) ("Because subject matter jurisdiction over [the party's] action exists by virtue of a federal question, rather than the diversity of the parties, the Due Process Clause that is at issue here is the Due Process Clause of the Fifth Amendment." (internal quotations and citation omitted)); 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1068.1 (3d ed. 2002) ("It is now clear that the Due Process Clause of the Fifth, rather than the Fourteenth, Amendment applies to the assertion of personal jurisdiction in the federal question context.").

11

*International Shoe* and its progeny, which assessed a party's minimum contacts with the forum state, dealt with the assertion of personal jurisdiction by state courts or federal courts sitting in diversity actions pursuant to the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Int'l Shoe Co.*, 326 U.S. at 311-12 (holding that Washington state court did not have personal jurisdiction under Fourteenth Amendment); *Hanson v. Denckla*, 357 U.S. 235, 251 (1958) (concluding that the Florida state court did not have personal jurisdiction over defendant based on the Fourteenth Amendment); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980) ("The issue before us is whether, consistently with the Due Process Clause of the Fourteenth Amendment, an Oklahoma court may exercise *in personam* jurisdiction . . . ."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772-75 (1984) (holding that, under *International Shoe*, the defendant magazine's act of publication in the forum state was sufficient to confer personal jurisdiction under the Fourteenth Amendment); *Burger King Corp.*, 471 U.S. at 463 (concluding that, in a diversity action, a federal district court in Florida could exercise personal jurisdiction against a Michigan franchisee under the Fourteenth Amendment). Under the Fourteenth Amendment, a court's assessment of an entity's contacts with the forum state is "a consequence of territorial limitations on the power of the respective States." *Hanson*, 357 U.S. at 251. In cases arising under federal law, however, this consideration is not relevant, because the United States's sovereign authority "extends to the physical boundaries of the nation." *Trans-Asiatic Oil, Ltd. S.A.*, 743 F.2d at 959; *cf.* Ronan E. Degnan & Mary Kay Kane, *The Exercise of Jurisdiction Over and Enforcement of Judgments Against Alien Defendants*, 39 Hastings L.J. 799, 812 (1988) ("The due process clause of the fourteenth amendment has no bearing at all on what American courts can do to foreigners. It regulates only what the courts of one American

state can do to persons who are in another American state.").  The Third Circuit recognized the distinction between the scope of the two Due Process Clauses in *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985):

> Although the minimum contacts test established by *International Shoe* is itself a fairness inquiry, the scope of that inquiry necessarily acknowledges that the constitutionality of a state's assertion of in personam jurisdiction reflects territorial limitations on the power of an individual state.  Those strictures of fourteenth amendment due process analysis which attempt to prevent encroachment by one state on the sovereignty of another do not apply with equal force to the adjudication of federal claim[s] in a federal court.

*Id.* at 295.  Thus, the Fourteenth Amendment's forum state analysis has no bearing on the assessment of minimum contacts in federal question cases under the Fifth Amendment.

Although the Supreme Court has declined to consider this issue on two separate occasions,[8] we note that our conclusion is in accordance with decisions of the First, Fifth, Seventh, and Eleventh Circuits.  *See, e.g.*, *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) ("[U]nder the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state."); *ISI Int'l, Inc.*, 256 F.3d at 551 (concluding that a national contacts analysis is appropriate because "[t]he due process clause protects persons from being haled into a court unless they have 'minimum contacts' with the sovereign that established that court," and that in a federal question action, "[t]he jurisdiction whose power federal courts exercise is the United States of America"); *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946 (11th Cir. 1997) (holding that a court must examine an entity's "aggregate contacts with the nation as a whole

---

[8] *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.* 484 U.S. 97, 103 n.5 (1989); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987) (O'Connor, J., plurality opinion).

rather than his contacts with the forum state in conducting the Fifth Amendment [due process] analysis"); *Jim Walter Corp.*, 651 F.2d at 256 (quoting *Stafford v. Briggs*, 444 U.S. 527, 554 (1980) (Stewart, J., dissenting))). We also note that in several decisions, including an interlocutory appeal in this matter, the Third Circuit has determined that "'a federal court's personal jurisdiction may be assessed on the basis of a defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process.'" *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002)). The underlying reasoning of the Third Circuit's decisions also supports our conclusion. If the Fifth Amendment prohibited the exercise of personal jurisdiction based on an entity's national contacts, then any statutory provision authorizing personal jurisdiction based solely on such contacts would be unconstitutional. The Third Circuit apparently recognized this consideration in *In re Automotive Refinishing Paint Antitrust Litigation*, stating that the exercise of personal jurisdiction under § 12 of the Clayton Act—which provided for nationwide (and worldwide) service of process on antitrust defendants—was "as broad as the limits of due process under the Fifth Amendment," and therefore could rely "on the basis of a[n] [entity]'s aggregate contacts with the United States as a whole." *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d at 298-99; *see also Max Daetwyler Corp.*, 762 F.2d at 294 (stating in dicta that the assertion of personal jurisdiction based on aggregate nationwide contacts "may be neither unfair nor unreasonable when assessed by fifth amendment [due process] standards"). Accordingly, we conclude that, under the Fifth Amendment, the relevant forum for assessing CEPE's minimum contacts is the United States as a whole.

2.      Minimum Contacts Analysis

A court may exercise personal jurisdiction based on general or specific contacts with the relevant forum.  *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001).  Specific jurisdiction exists when the cause of action "arises out of" or is "related to" the entity's forum-related activities.  *Pinker*, 292 F.3d at 368 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)); *see also Gen. Elec. Co.*, 270 F.3d at 150 ("A nexus between the [entity], the forum and the litigation is the essential foundation of in personam jurisdiction."). General jurisdiction is based upon an entity's "'continuous and systematic' contacts with the forum" and may exist even when the plaintiff's cause of action is unrelated to the entity's non-forum related activities.  *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).

We apply a two-part test to determine whether specific jurisdiction exists.  *IMO Indus. v. Keikert AG*, 155 F.3d 254, 259 (3d Cir. 1998).  First, "[t]he constitutional touchstone of due process analysis is 'whether the [entity] purposely established minimum contacts in the forum,'" *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000) (quoting *Burger King Corp.*, 471 U.S. at 474)), such that it could "'reasonably anticipate[ ] being haled into court there.'"  *Pennzoil Prods. Co. v. Colelli & Assocs.*, 149 F.3d 197, 201 (3d Cir. 1998) (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297).  Second, a federal court may only exercise personal jurisdiction if it "would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe Co.*, 326 U.S. 310, 320 (1945)).

Once a jurisdictional defense is raised, we are required to make an independent factual assessment of an entity's contacts with the forum to determine whether we possess personal jurisdiction.  *Mellon Bank v. Farino*, 960 F.2d 1217, 1224 (3d Cir. 1992).  "Each case must be

judged on its particular facts." *Id.* Plaintiffs "bear[] the burden of demonstrating contacts with the forum state sufficient to give the court in personam jurisdiction.'" *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir. 1984) (quoting *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A.*, 723 F.2d 357, 362 (3d Cir. 1983)). Plaintiffs may not rest solely on the pleadings to satisfy their burden of proof, however. *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). Rather, they must present evidence that demonstrates a prima facie case for the exercise of personal jurisdiction. *Farino*, 960 F.2d at 1223; *Carteret Sav. Bank*, 954 F.2d at 146. We may consider all undisputed evidence submitted by Plaintiffs and CEPE. *Time Share Vacation Club*, 735 F.2d at 67 n.9.

Because an incorporated organization is a "legal fiction," the question of whether it "has made [sufficient] contacts justifying the exercise of personal jurisdiction is, in reality, a question of whether the contacts made by the agents and employees of the corporation are sufficient to justify the exercise of jurisdiction."[9] 16 Moore's Federal Practice § 108.42[3][b][ii]; *see also Int'l Shoe Co.*, 326 U.S. at 316 ("Since the corporate personality is a fiction, . . . it is clear that . . . its 'presence' . . . can be manifested only by activities carried on in its behalf by those who are authorized to act for it."). "[The] acts of the corporation's agents and employees" therefore are to "be attributed to the corporation for jurisdictional purposes, so long as the acts were within the course and scope of the agency or employment." 16 Moore's Federal Practice § 108.42[3][b][ii]; *see also Miller Yacht Sales v. Smith*, 384 F.3d 93, 101 n.7 (2004) (holding that the contacts of a corporation's agents with the forum are attributable to the corporation).

---

[9] For purposes of determining personal jurisdiction, an unincorporated association is treated the same as a corporation. *Nehemiah v. Athletics Congress of the U.S.A.*, 765 F.3d 42, 47 (1985).

We are satisfied that CEPE has sufficient minimum contacts with the United States

arising out of, or related to, the present litigation to support the exercise of specific jurisdiction.[10]

Specific personal jurisdiction may be established based on an entity's communications with

parties in the forum, even if the entity itself has not had a physical presence in the forum.  In

*Burger King Corp. v. Rudzewicz*, the Supreme Court stated that the assertion of specific

jurisdiction

> may not be avoided merely because the defendant did not *physically* enter the
> forum State.  Although territorial presence frequently will enhance . . . affiliation
> with a [forum] and reinforce the reasonable foreseeability of suit there, it is an
> inescapable fact of modern commercial life that a substantial amount of business
> is transacted solely by mail and wire communications across state lines, thus
> obviating the need for physical presence within a [forum] in which business is
> conducted.

471 U.S. at 476; *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 453-54 (3d Cir.

2003) (holding that "telephone and fax communications directed to the forum . . . may form part

of the 'something more' needed to establish personal jurisdiction").  Here, CEPE employees and

representatives directed numerous communications to members of the Worldwide P-O.G. located

in the United States.  For example, in 1999 and 2000, Schoder, CEPE's Secretary General, sent

draft minutes of the Worldwide P-O.G.'s meetings and data on sales volume to employees of

DuPont, PPG, Sherwin-Williams, and NPCA via facsimile.  *See, e.g.*, Doc. No. 141 Ex. R

(minutes of 4/28/00 meeting in Brussels, Belgium); *id.* Ex. AA at NPCA1555 (minutes of

12/8/00 meeting in Orlando, Florida); *id.* Ex. AF (cover letter and submission form for collecting

worldwide vehicle refinishing statistics); Doc. No. 151 Ex. 2 (sales volume data for first quarter

---

[10] Because we conclude that specific jurisdiction may be asserted over CEPE, we need not
address Plaintiffs' argument that CEPE is subject to general jurisdiction based on its "continuous
and systematic contacts" with the United States.  (Doc. Nos. 143 at 4-7, 151 at 3-13.)

1998 and first quarter 1999); *id.* Ex. 14 (sales volume data for 1999).  In addition, Schoder and

another CEPE employee contacted employees of Defendants located in the United States by

facsimile regarding the hiring of Herman-Josef Drexler as coordinator of the Worldwide P-O.G.

(Doc. No. 151 Exs. 6, 8-9.)  Frequent email correspondence with individuals in the forum also

may constitute sufficient evidence of minimum contacts.  *See, e.g.*, *Schiller-Pfeiffer, Inc. v.*

*Country Home Prods.*, Civ. A. No. 04-1444, 2004 U.S. Dist. LEXIS 24180, at *20 (E.D. Pa. Dec.

1, 2004) (concluding that "substantial . . . email communications" with a corporation located in

the forum may qualify as sufficient evidence of minimum contacts for the exercise of personal

jurisdiction).  Drexler communicated with members of the Worldwide P-O.G. located in the

United States on numerous occasions in 2000 and 2001 regarding the organization of upcoming

Worldwide P-O.G. meetings, the drafting and circulation of the minutes of these meetings, and

the distribution of sales volume information to several of Defendants' employees.  (Doc. No. 143

Exs. U, AC-AE; Doc. No. 151 Exs. 12, 18-19, 27-28, 37-39, 43-47.)

Regular business trips or personal visits to the forum by an entity's employees or agents

can also establish the necessary minimum contacts for the exercise of specific jurisdiction.  *See,*

*e.g.*, *Toys "R" Us, Inc.*, 318 F.3d at 454; *see also CDV Mgmt., L.P. v. Integrated Airline Servs.,*

*Inc.*, Civ. A. No. 04-4173, 2005 U.S. Dist. LEXIS 1368, at *12-14 (E.D. Pa. Jan. 31, 2005)

(finding that multiple visits by defendant's Chief Executive Officer to plaintiff's offices in the

forum conferred specific personal jurisdiction over defendant).  CEPE representatives and

employees (including Schoder and Drexler) attended numerous CEPE- or IPPIC-sponsored trade

meetings in the United States during the Class Period, including meetings in Orlando, Florida, in

November, 1996 (Doc. No. 151 Ex. 22 at BASF001009854); Las Vegas, Nevada, on December

4, 1997 (*Id.* Ex. 23 at BASF 003 012539-003 012541); Dallas, Texas, on December 3, 1998

(Doc. No. 143 Ex. P at SW0307035); Atlanta, Georgia, on December 3, 1999 (Schoder) (Doc.

No. 151 Ex. 4 at SW2500037, Ex. 24 at NPCA1394-NPCA1398); Boston, Massachusetts, on

September 7-8, 2000 (Schoder) (*Id.* Ex. Q); and Orlando, Florida, on December 8, 2000 (Schoder

and Drexler) (Doc. No. 141 Ex. AA).  Drexler also attended meetings with employees of several

Defendants in Las Vegas, Nevada, on November 30, 2001 (Doc. No. 151 Ex. 27 at

DRC18600031) and in Washington, D.C., on January 28-29, 2002.  (*Id.* Ex. 40.)

      We are also satisfied that these contacts arose out of, or are closely related to, Plaintiffs'

antitrust claims.  In this action, Plaintiffs allege that Defendants engaged in an illegal conspiracy

to fix or maintain prices for automotive refinishing paint sold in the United States in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1.  (Doc. No. 13 ¶¶ 1-2, 15-25, 51-53.)  Plaintiffs

specifically allege that Defendants "participated in meetings and conversations, including

through various trade organizations and at conventions," and "agree[d] during those meetings to

fix . . . the prices at which automotive refinishing paint was sold in the United States."  (*Id.* ¶¶

52(a), 52(b); *see also* ¶ 46.)  Thus it would appear that Plaintiffs' antitrust claims arise, at least in

part, out of CEPE's contacts with the United States, as the submitted documents demonstrate that

CEPE and its employees organized numerous meetings of the Worldwide P-O.G. and that

representatives of Defendants participated in these meetings.  (Doc. No. 141 Exs. R, S, U, AA,

AD, AE; Doc. No. 151 Exs. 2-4, 12, 16, 18-21, 24, 27-29, 31, 35, 38-40.)  CEPE also assisted in

the collection of sales volume data for automotive refinishing paint and the distribution of this

data to Defendants' employees.  (Doc. No. 151 Exs. 2-3, 10-20.)  As we noted in a prior opinion

in this matter (Doc. No. 138 at 7-8), trade associations can be used to facilitate the creation or

maintenance of illegal price-fixing conspiracies, especially when competitors share pricing or sales data through the association. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 581-82 (1978); *United States v. Andreas*, 216 F.3d 645, 657 (7th Cir. 2000); *see also* Christoper R. Leslie, *Trust, Distrust, and Antitrust*, 82 Tex. L. Rev. 515, 612 (2004) ("Perhaps the most common monitoring system [for an illegal price-fixing conspiracy] is for cartel members to designate one member to serve a term as the cartel secretary, who collects individual sales figures and reports the market shares of each member back to the cartel as a whole."). Evidence of communication and cooperation among Defendants through the aegis of a trade association may also be relevant to establish the existence of a conspiracy or combination, which is a required element of a Section 1 Sherman Act claim. *See, e.g.*, *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) ("[A] high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy."); *cf. In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 1049433, at *11-13 (D.D.C. June 20, 2001) (finding documents related to defendants' foreign price fixing activities relevant evidence regarding the creation and maintenance of an illegal conspiracy or combination).  Accordingly, we conclude that CEPE has sufficient minimum contacts with the forum for the exercise of specific jurisdiction.

### 3.     Fair Play and Substantial Justice

Once a court has determined that minimum contacts exist, it must then examine whether jurisdiction over a defendant would comport with traditional notions of "fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.  A heavy burden rests with Defendants to show that the exercise of jurisdiction would be unreasonable under this requirement. *Grand Entm't Group*,

988 F.2d at 483; *see also Carteret Savings Bank*, 954 F.2d at 150 (holding that once plaintiff has made out a prima facie case of minimum contacts, "defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" (quoting *Burger King Corp.*, 471 U.S. at 477)).

"In the context of state courts, the Supreme Court has stated that this inquiry requires evaluating 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most effective resolution of controversies, and the shared interests of the several States in furthering fundamental substantive social policies.'" *Pinker*, 292 F.3d at 370 (quoting *Burger King Corp.*, 471 U.S. at 477 (internal quotation marks omitted)).  The Third Circuit has stated that "[i]n the federal court context, [however,] the inquiry will be slightly different, taking less account of federalism concerns and focusing more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing."[11]  *Id.* at 370-71 (internal citation omitted).

Here, we conclude that the exercise of personal jurisdiction over CEPE would not violate traditional notions of "fair play and substantial justice."  There is "undoubtedly . . . a strong national interest in [effective] antitrust enforcement."  *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S.

---

[11] In a footnote in *Pinker,* the Third Circuit noted that there has been "some debate as to whether this ["fair play and substantial justice"] prong ought to apply in the context of a federal statute authorizing nationwide service of process."  *Pinker*, 292 F.3d at 371 n.2 (citations omitted).  Although the court in *Pinker* did not resolve that debate, it stated that although the Supreme Court had not resolved the issue, the Third Circuit had previously "hinted that a fairness analysis consisting of more than an assessment of the [entity]'s national contacts would be appropriate."  *Id.*  We will analyze whether the exercise of personal jurisdiction over CEPE is consistent with "traditional notions of fair play and substantial justice."

623, 635 (1977) (Rehnquist, J., plurality opinion); *see also In re Vitamin Antitrust Litig.*, MDL No. 1285, 2001 U.S. Dist. LEXIS 11536, at *67 (D.D.C. Apr. 23, 2001) ("[T]he United States has a strong national interest in enforcement of the antitrust laws.").  As the Supreme Court has noted, "every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. . . .  This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation."  *Hawaii v. Std. Oil Co. of Cal.*, 405 U.S. 251, 262 (1972).  To promote this objective, courts have recognized that "a broad scope of discovery is particularly appropriate in antitrust litigation because, for example, relevant business documents pertaining to the antitrust conspiracy may not exist and covert behavior may have to be proven through less direct means."  *In re Microcrystalline Antitrust Litig.*, 221 F.R.D. 428, 429-30 (E.D. Pa. 2004); *see also* Note, *Strict Enforcement of Extraterritorial Discovery*, 38 Stan. L. Rev. 841, 841 (1986) (observing that ineffective foreign antitrust discovery may result in loss of vindication of substantive rights).  There is also a substantial interest in the ability of the Class to obtain convenient and effective relief.  This would be hindered by declining to assert personal jurisdiction over CEPE and instead resorting to the Hague Convention's discovery procedures, which have been characterized as "time-consuming and cumbersome."  *Pharmachemie B.V. v. Pharmacia S.p.A.*, 934 F. Supp. 484, 489 (D. Mass. 1996); *see also First Am. Corp.*, 154 F.3d at 23; *Valois of Am., Inc., v. Risdon Corp.*, 183 F.R.D. 344, 349 (D. Conn. 1997).  In addition, it was foreseeable that, through its involvement with United States corporations, corporate subsidiaries, and trade associations in the Worldwide P-O.G., and organization of meetings in the United States, CEPE might be subject to court proceedings in the United States in potential antitrust actions.  When an organization "'purposefully avails itself of

22

the privilege of conducting activities within the forum,'" *Hanson*, 357 U.S. at 253, its "conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.*, 444 U.S. at 297.  Minutes of the Worldwide P-O.G. meetings indicate that CEPE had adopted an antitrust policy, and that the existence of the policy was mentioned at the beginning of the P-O.G.'s meetings in the United States.  (Doc. No. 143 Exs. R at SW2123585, AA at NPCA1555; Doc. No. 151 Exs. 27, 41.)  Clearly, CEPE recognized that it was possible that it might be "haled into court" in the United States.  These considerations outweigh any burden imposed on CEPE as a result of the discovery requests. Accordingly, we conclude that the assertion of personal jurisdiction over CEPE comports with traditional notions of fair play and substantial justice.

**B.     Federal Rule of Civil Procedure 45(a)(2)**

CEPE asserts that the Plaintiffs' subpoena exceeds the geographic limitations of Federal Rule of Civil Procedure 45.  (Doc. No. 148 at 10-12.)

Federal Rule of Civil Procedure 45(a)(2) states, in relevant part, that "a subpoena for production or inspection shall issue for the court in which the production or inspection is to be made."  Fed. R. Civ. P. 45(a)(2).  Federal Rule of Civil Procedure 45(b)(2) provides that a subpoena duces tecum may validly be served in any of three different ways:

> [A] subpoena may be served at any place within the district of the court by which it was issued, or at any place without the district that is within 100 miles of the place of the deposition, hearing, production, or inspection specified in the subpoena[,] or at any place within the state where a state statute or rule of court permits service of a subpoena issued by a state court of general jurisdiction . . . .

Fed. R. Civ. P. 45(b)(2).  Accordingly, a subpoena for production of documents may be served on a witness "at any place within the district of the court by which it was issued."

CEPE argues that the subpoena is invalid because all of the requested documents are located in Belgium, and the discovery rules cannot be used to require a non-party to produce documents not located within 100 miles of the district.  (Doc. No. 148 at 11.)  We disagree.  The word "production" in Federal Rule of Civil Procedure 45(a)(2) "refers to the delivery of documents, not their retrieval."  *Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 412 (3d Cir. 2004).  Thus, "'the district in which the production . . . is to be made' is not the district in which the documents are housed[,] but the district in which the subpoenaed party is required to turn them over."  *Id.*; *see also* Fed. R. Civ. P. 45(a)(2) advisory committee note ("Paragraph (a)(2) makes clear that the person subject to the subpoena is required to produce materials in that person's control *whether or not the materials are located within the District or within the territory within which the subpoena can be served*." (emphasis added)); 9A Federal Practice and Procedure § 2456, at 31 (2d ed. 1995 & 2004 Supp.) ("Even records kept beyond the territorial reach of the district court issuing the subpoena may be covered if they are controlled by someone subject to the court's jurisdiction.").  In this case, Plaintiffs served Schoder, CEPE's Secretary General, with a subpoena issued by the United States District Court for the District of Columbia while Schoder was in the District.  (Doc. No. 143 Ex. D; Schoder Decl. ¶ 7.)  The subpoena requests that the specified documents be produced at Plaintiffs' law offices located in the District of Columbia.  The subpoena complies with the territorial limitations of Rule 45.

## C.    Hague Convention

CEPE also argues that Plaintiffs should be required to invoke the discovery procedures of the Hague Convention in order to obtain discovery.  (Doc. No. 148 at 14-16.)  This is clearly incorrect.  Resorting to the Hague Convention is not even an option because Belgium is not a

24

signatory to the treaty.  *See* 28 U.S.C. § 1781 note (Belgium not listed as a party to the treaty);

*see also Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 (1st Cir.

2004) (concluding that a lettor rogatory should not be issued because "Belgium is not a signatory

to the Hague Convention"); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 55 (D.D.C. 2000)

(declining to invoke Hague Convention mechanisms for discovery from parties located in

Belgium because the country is not a signatory to the treaty).

Even if the Hague Convention did apply, however, Plaintiffs would not be required to

invoke it as a matter of first resort.  In *Societe Nationale Industrielle Aerospatiale v. United*

*States District Court* ("*Aerospatiale*"), 482 U.S. 522 (1987), the Supreme Court analyzed the text

and history of the treaty, and concluded that the Hague Convention was not the exclusive

procedure for obtaining documents located in a foreign signatory's territory.  *See id.* at 536

(concluding that the Hague Convention was "intended as a permissive supplement, not a

preemptive replacement, for other means of obtaining evidence located abroad").  *Aerospatiale*

also rejected the argument that a party had to initially resort to the Hague Convention, either as a

matter of binding law or international comity and respect for foreign nations, before seeking

discovery under the Federal Rules of Civil Procedure.[12]  *Id.* at 539-43.

### D.  Undue Burden

Finally, CEPE objects to the subpoena on the grounds that compliance with the document

---

[12] CEPE's argument for invoking the Hague Convention completely omits any discussion of *Aerospatiale*.  This failure is even more disturbing in light of the fact that the Third Circuit extensively discussed the *Aerospatiale* case in an interlocutory appeal in this matter and concluded that Plaintiffs were not obligated to resort to the Hague Convention's procedures for service of process on a foreign defendant.  *In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d at 300-05.

requests would be unreasonable and unduly burdensome. (Doc. No. 148 at 12-14.) CEPE asserts that the subpoena requests a broad range of documents, electronic files, and emails that would require contracting with information technology professionals and providing the assistance of at least one of its own employees. (*Id.* at 12-13.) CEPE also objects to the "substantial costs" that it believes it would incur from compliance with the discovery requests.

Pursuant to Federal Rule of Civil Procedure 45(c)(3), a district court "shall quash or modify a subpoena if it . . . subjects a person to an undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv). A discovery objection based on "'undue burden' can be evaluated by considering factors such as 'relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Gabe Staino Motors v. Volkswagen of Am.*, Civ. A. No. 99-5034, 2003 U.S. Dist. LEXIS 3194, at *5 (E.D. Pa. Feb. 28, 2003) (quoting *Alexander v. FBI*, 186 F.R.D. 21, 34 (D.D.C. 1998)). The witness's status as a nonparty to the litigation should also be considered. *Id.* at *5-6. We must keep in mind the Supreme Court's instruction in *Aerospatiale* that courts supervising pretrial discovery proceedings over foreign entities "should exercise special vigilance to protect [them] from the danger that unnecessary, or unduly burdensome, discovery may place them in an disadvantageous position." *Aerospatiale*, 482 U.S. at 546; *see also id.* ("Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad . . . the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses.").

Plaintiffs have requested the discovery of numerous documents, electronic files, and other

records from January 1, 1990, through the present regarding the following subjects: (1) CEPE's

organizational structure; (2) Defendants' affiliations and involvement with CEPE and its

affiliates, including the Worldwide P-O.G.; (3) minutes of meetings of CEPE and its affiliates,

including the Worldwide P-O.G.; (4) information and exchanges of information involving CEPE

and/or Defendants regarding the prices of automotive refinishing paint; (5) information and

exchanges of information involving CEPE and/or Defendants regarding Defendants' market

shares for automotive refinishing paint; (6) information related to any claims, litigation, and other

governmental proceedings or investigations, foreign or domestic, concerning the pricing,

marketing, distribution, and sales of automotive refinishing paint; and (7) CEPE's document

retention policies. (Doc. No. 143 at 10-13, Ex. D.) While we agree with Plaintiffs that the

requested information is relevant and directly pertains to its antitrust claims against Defendants,

*see, e.g.*, Doc. No. 138 at 4-9, the scope of requested production is very broad, encompassing all

written, electronic, and other records created or received by CEPE from 1990 until the present.

Compliance with such a request would be burdensome for CEPE, a non-profit trade association

that has a staff of only eight (8) employees and is not a party to this action. (Schoder Decl. ¶ 8.)

Accordingly, we will impose several limitations and restrictions on Plaintiffs' requests for

production of documents. *See, e.g.*, *In re Microcrystalline Cellulose Antitrust Litig.*, 221 F.R.D.

at 430 (recognizing that while "a broad scope of discovery in this large [antitrust] class action is

appropriate," time and scope limitations may be placed on the plaintiff's discovery requests).

First, CEPE shall be required to produce only the requested documents and records created or

received from January 1, 1993, the beginning of the Class Period, through May 31, 2002, when

Plaintiffs assert that the Worldwide P-O.G. appears to have stopped meeting because of the

members' concerns about the United States Department of Justice's antitrust investigation.  (Doc.
No. 151 at 8, Ex. 31.)  Second, CEPE shall not be required to comply with Plaintiff's Document
Request No. 8, which seeks "all documents concerning [CEPE's] public advocacy, public
awareness, or public information programs or services related to automotive refinishing paint,
including any position papers."  (Doc. No. 151 Ex. D at unnumbered 13.)  This information does
not appear to be related to the alleged price fixing conspiracy, and all publicly released
documents may be obtainable from other sources.  *See* Fed. R. Civ. P. 26(b)(2) (stating that a
court may limit discovery "if it determines that . . . the discovery sought . . . is obtainable from
some other source that is more convenient, less burdensome, or less expensive").  Third, CEPE
shall not be required to comply with Plaintiff's Document Request No. 20, which requests
"[l]ists of the identity, location, and ownership of all automotive refinishing paint plants, storage
facilities, and capacity date for each."  (Doc. No. 151 Ex. D at unnumbered 16.)  This
information may be obtained directly from the automotive paint manufacturers.

Finally, to alleviate the financial burden on CEPE, we will require that Plaintiffs
compensate CEPE for the costs of production.  Federal Rule of Civil Procedure 45(c) provides
that "an order to compel production shall protect any person who is not a party . . . from
significant expense resulting from the inspection and copying commanded."  Fed. R. Civ. P.
45(c)(2)(B); *see also id.* advisory committee note ("A non-party required to produce documents
or materials is protected against significant expenses resulting from involuntary assistance to the
court.").  Under this rule, "[a] nonparty's legal fees, especially where the work benefits the
requesting party, have been considered a cost of compliance reimbursable."  *First Am. Corp. v.
Price Waterhouse LLP*, 184 F.R.D. 234, 241 (S.D.N.Y. 1998).  This is because "'[n]onparty

witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party.'" *In re Letters Rogatory Issued by Nat'l Court of First Instance in Commercial Matters*, 144 F.R.D. 272, 278 (E.D. Pa. 1992) (quoting *United States v. Columbia Broad. Sys.*, 666 F.2d 364, 371 (9th Cir. 1982)).

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: AUTOMOTIVE REFINISHING    :
PAINT ANTITRUST LITIGATION       :        MDL NO. 1426
                                 :

## **ORDER**

_____AND NOW, this 29th day of June, 2005, upon consideration of Plaintiffs' Motion to

Compel the European Council of the Paint, Printing Ink and Artists' Colours Industry ("CEPE")

to Respond to Plaintiffs' Request for Production of Documents (Doc. No. 143, MDL No. 1426),

and all documents filed in support and opposition thereof, it is ORDERED that:

1.      Plaintiff's Motion to Compel is GRANTED with respect to Document Request

Nos. 1-7, 9-19, and 21-23, for all documents created or received by CEPE from

January 1, 1993, through May 30, 2002.

2.      Plaintiff's Motion to Compel is DENIED in all other respects.

IT IS SO ORDERED.


                                        BY THE COURT:



                                        S:/R. Barclay Surrick, Judge